IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| DYNAMIC APPLET TECHNOLOGIES, LLC, | |
| Plaintiff, | CASE NO. 4:17-cv-00878 |
| v. | PATENT CASE |
| HOLLISTER CO., | JURY TRIAL DEMANDED |
| Defendant. | |

**DEFENDANT HOLLISTER CO.'S**
**RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page(s)**

I.    Statement of Issue ........................................................................................ 2

II.   Background ................................................................................................... 3

    A.   Stage and Nature of the Proceedings ............................................... 3

    B.   The Patent-in-Suit ............................................................................ 3

III.  Legal Standard .............................................................................................. 8

    A.   This Case Should Be Disposed of at the Pleading Stage through Rule 12(b)(6). ........................................................................................... 8

    B.   The Law of 35 U.S.C. § 101 ............................................................ 9

IV.   Argument ..................................................................................................... 11

    A.   The Patent-in-Suit is Invalid Under 35 U.S.C. § 101 .................... 11

        1.   *Alice* Step 1 ......................................................................... 11

        2.   *Alice* Step 2 ......................................................................... 20

        3.   The remaining claims are also abstract. ............................... 23

    B.   The Disproportionate Risk of Preemption Confirms that the Claims Are Abstract ................................................................................... 24

V.    Conclusion .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas v. DirectTV, LLC,*
838 F.3d 1253 (Fed. Cir. 2016) .......................................................................17, 19, 20, 22

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
134 S. Ct. 2347 (2014) .................................................................................................. *passim*

*Apple, Inc. v. Ameranth, Inc.,*
842 F.3d 1229 (Fed. Cir. 2016) ....................................................................................17, 19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...............................................................................................................8

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),*
687 F.3d 1266 (Fed. Cir. 2012) ......................................................................................1, 9

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC,*
827 F.3d 1341 (Fed. Cir. 2016) ...........................................................................................22

*Bilski v. Kappos,*
561 U.S. 593 (2010) .............................................................................................9, 10, 12, 13

*buySAFE v. Google, Inc.,*
765 F.3d 1350 (Fed. Cir. 2014) ...........................................................................................21

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
776 F.3d 1343 (Fed. Cir. 2014) .............................................................................12, 13, 18

*Core Wireless Licensing S.A.R.L. v. LG Elecs, Inc.,*
880 F.3d 1356, 2018 WL 542672 (Fed. Cir. 2018) .............................................................19

*Cuvillier v. Sullivan,*
503 F.3d 397 (5th Cir. 2007) ..........................................................................................8, 9

*CyberSource Corp. v. Retail Decisions, Inc.,*
654 F.3d 1366 (Fed. Cir. 2011) ...........................................................................................10

*DDR Holdings, LLC v. Hotels.com, L.P.,*
773 F.3d 1245 (Fed. Cir. 2014) ...........................................................................................22

*Dealertrack, Inc. v. Huber,*
   674 F.3d 1315 (Fed. Cir. 2012) ...................................................................17, 21

*Diamond v. Chakrabarty,*
   447 U.S. 303 (1980)...................................................................................................9

*Diamond v. Diehr,*
   450 U.S. 175 (1981).................................................................................................10

*Elec. Power Group, LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) ...........................................................17, 18, 20

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) .........................................................................19

*Fort Props., Inc. v. Am. Master Lease LLC,*
   671 F.3d 1317 (Fed. Cir. 2012) .........................................................................10

*Intellectual Ventures I LLC v. Capital One Bank (USA),*
   792 F.3d 1363 (Fed. Cir. 2015) ...........................................................11, 21, 23

*Intellectual Ventures I LLC v. Symantec Corp.,*
   838 F.3d 1307 (Fed. Cir. 2016) ...........................................................16, 19, 22

*Internet Patents Corp. v. Active Network, Inc.,*
   790 F.3d 1343 (Fed. Cir. 2015) ...........................................................17, 18, 21

*Lovelace v. Software Spectrum,*
   78 F.3d 1015 (5th Cir. 1996) ...............................................................................8

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.,*
   66 F. Supp. 3d 829 (E.D. Tex. 2014)...............................................................24

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   132 S. Ct. 1289 (2012).....................................................................................10, 23

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
   837 F.3d 1299 (Fed. Cir. 2016) .......................................................................19, 20

*Morales v. Square, Inc.,*
   75 F. Supp. 3d. 716 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir.
   2015), *cert. denied*, 136 S. Ct. 1461 (2016) ...............................................................12

*Parker v. Flook,*
   437 U.S. 584 (1978).................................................................................................10

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.,*
    No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ...........................12

*Synopsys, Inc. v. Mentor Graphics Corp.,*
    839 F.3d 1138 (Fed. Cir. 2016) ..............................................................................................22

*In re TLI Commc'ns LLC Patent Litig.,*
    823 F.3d 607 (Fed. Cir. 2016) ................................................................................16, 17, 19

*Two-Way Media Ltd. v. Comcast Cable Comms., LLC,*
    874 F.3d 1329 (Fed. Cir. 2017) ...................................................................................17, 18

*Ultramercial, Inc. v. Hulu,*
    LLC, 772 F.3d 709 (Fed. Cir. 2014) ..............................................................................9, 20

*Visual Memory LLC v. NVIDIA Corp.,*
    867 F.3d 1253 (Fed. Cir. 2017) ...........................................................................................19

**Statutes**

35 U.S.C. § 101 ................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12...........................................................................................1, 2, 3, 8, 11

Hollister Co. moves to dismiss Dynamic Applet Technologies, LLC's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure for failure to state a claim upon which relief can be granted. The claims of the Patent-in-Suit are directed to an abstract idea: bundling and sending information responsive to a request. Abstract ideas like this, even when implemented using conventional computer components, are not eligible for patent protection under 35 U.S.C. § 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2357 (2014).

The applicant for the Patent-in-Suit acknowledged that computer programs known as Java "applets" were commonplace. He also described that conventional web servers would collect and send information via this Java applet to a mobile device in response to a request from the mobile device. The applicant noted that traditionally these Java applets may require multiple transmissions to acquire "needed data" and additional functionality. So he proposed bundling the Java applet with "needed data" and functional components in order to send this data in a single transmission. In other words, the patentee simply wanted to provide a "faster and more efficient" method to send all necessary components in one bundle. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible").

But the invention the applicant claimed did not limit itself to a specific mechanism for improving these prior art Java applets using bundling. Under Dynamic's interpretation of the claims, bundling *any* kind of computer "program code that can be used" is an "applet" with information captured by its alleged invention. The specification

and claims also do not recite any new technical means for bundling this information: *any* method could be used to transmit the information in a single shot. Nor are the claims limited to any specific, non-conventional hardware or software required to either bundle or send the applet. Instead, the specification discloses only that the alleged invention uses off-the-shelf computers components and devices like a "cellular phone" and a "server" to perform conventional activities like "receiving," "collecting," "generating," and "transferring" information. Dynamic's patent does no more than withdraw a basic idea (bundling and sending information responsive to a request) from the public domain without disclosing any particularized, inventive way of accomplishing that idea. Therefore, the Patent-in-Suit is directed to the abstract ideas and is invalid under 35 U.S.C. § 101 for failure to claim patent-eligible subject matter.

Resolving these issues does not require discovery or formal claim construction, as Dynamic admitted in its Complaint that "[t]he scope and construction of the claims of the [Patent-in-Suit] have been clarified" in prior litigation. (Dkt. 1, ("Compl.") ¶ 25.) To avoid waste of judicial and party resources unnecessarily litigating an invalid patent, Hollister thus requests that the Court dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## I.        STATEMENT OF THE ISSUE

Abstract ideas are ineligible for patentability under 35 U.S.C. § 101, absent an inventive concept that amounts to significantly more than the abstract idea. The Patent-in-Suit is directed to the abstract idea of bundling and sending information responsive to

a request. The Patent-in-Suit does not include an inventive concept beyond that idea. Should the Court therefore dismiss Dynamic's Complaint pursuant to Rule 12(b)(6) for failure to state a claim?

## II.     BACKGROUND

### A.     Stage and Nature of the Proceedings

On December 15, 2017, Dynamic filed this lawsuit accusing Hollister of infringing U.S. Patent No. 6,446,111. Dynamic accuses Hollister of infringing "at least claims 17, 22, 23, and 26" of the Patent-in-Suit by Hollister's alleged dynamic generation of web pages with data specific to a user's request. (*See* Compl. ¶¶ 26–53.)

### B.     The Patent-in-Suit

The '111 Patent issued on September 3, 2002, and is entitled, "Method and Apparatus for Client-Server Communication Using a Limited Capability Client Over a Low-Speed Communications Link." (Compl. ¶ 27.) The stated need identified in the patent is "a method and apparatus for responding to a client request so as to reduce bandwidth usage over a low-speed connection and reduce the consumption of storage space on the client." '111 Patent, 2:29–32. The patent purports to meet this need for conventional executable applets by "including all or most of the required data and the associated functionality in a single transmission to the client." *Id.* at 8:4–8.

The specification concedes that the idea of collecting and sending information in response to requests was not new. *See id.* at 1:22–40, 2:10–19. For example, the specification specifically discloses the prior use of executable applets, such as Java applets, as a "method for providing dynamic web pages." *Id.* at 5:61–6:6. According to

the specification, the provision of dynamic web pages was not new. *Id.* at 5:1–18. As the

specification explains, dynamic web pages, which provide different information to

different users of client devices, "typically require[d] the use of programs on the server

external to the web page to change the web page for the different clients." *Id.* at 5:1–6. The

specification describes the following prior art example:

> For example, in order to include the name of a person
> accessing the web page using the web browser, the web server
> would have to use an additional, external program in
> addition to the web page. The external program would
> acquire the user's name, build a new web page incorporating
> that name, save that web page on the web server, and then
> send the newly created web page to the client.

*Id.* at 5:12–18.

The specification alleges that, in the prior art, Java applets had to go over a network

multiple times "to get classes and objects needed by the applet, and again to get

the . . . data that the Java applet require[d]." So the applicant sought to make these applets

more efficient by simply "including all or most of the required data and the associated

functionality in a single transmission to the client." *Id.* at 7:63–8:8. The applicant's concern

was thus to provide a more efficient Java applet response to a request by merely reducing

the number of transmissions to the client.

Claim 17 of the '111 Patent, set forth below, is representative of the claims:

17. A method of processing data comprising:

> receiving a data request from a client device at a server system over a
>     communications link;

> collecting on the server a plurality of data items in response to the data
>     request;

> generating an executable applet dynamically in response to the data request, a constituent system associated with the applet including a subset of the data items therein as pre-loaded values;
>
> wherein a further constituent system associated with the executable applet comprises a data interface capability configured to provide a plurality of operations on the pre-loaded values, the operations comprising operations associated with the subset of the data items; and
>
> transferring the applet to the client device.

*Id.* at cl. 17.

Stripped of its excess and functional verbiage, claim 17 can be broken down into four main steps: (i) receiving a data request from a client; (ii) collecting data responsive to the request; (iii) generating an "executable applet" with the data and functionality to use the data; and (iv) transferring the applet to the client. Put simply, claim 17 is directed to bundling and sending information responsive to a request.

The applicant made clear through his own language in the specification that the components for carrying out the claimed method are nothing more than generic computing and networking elements. For example, the claimed "client device" can be virtually any computer or mobile device capable of connecting to a network. *Id.* at 8:15–17 ("[T]he client 12 may comprise a handheld or credit-card-size portable computing device with limited physical memory."); *id.* at 8:21–24 ("The client 12 may also comprise any other suitable type of computer or electronic device comprising physical memory that may be coupled to the communications link 16."). Even though the applicant's purported motivation was to solve problems with limited capability-clients such as simple cellular phones, the claims are not limited to a specific improvement in this area.

The claimed "server" that "collect[s] . . . a plurality of data items in response to the data request" can be virtually any computer system capable of acting as a server. *Id.* at 3:49–51 ("The server is typically a single powerful computer or a group of computers that may behave as a single computer.); *id.* at 3:54–56 ("For example, the server may comprise a mainframe, mini-computer, or powerful personal computer."); *id.* at 9:7–10 ("The server computer 18 may also comprise any variety of suitable server computer systems well known in the art which operate similarly to the server 18."). The claims are thus not limited to any specific kind of server—whether or not it suffered from the prior art problem of transmitting Java applets in multiple transmissions.

The claimed "communications link" can be any wired or wireless connection capable of connecting a client device to a server. *Id.* at 8:11–14 ("A communications link 16 may either directly connect the client 12 to the server 18 or indirectly connect the client 12 to the server 18 through a network 14."); *id.* at 8:47–50 ("The communications link 16 may comprise any of a variety of other suitable wireless and non-wireless communications links well known in the art for coupling clients 12 to servers 18."). The claims are not limited to the specific networks that suffered from limited bandwidth in which transmitting Java applets in multiple transmissions posed a problem.

The claimed "applet" that is "generat[ed] . . . in response to the data request" may "comprise a Java, ActiveX or other suitable type of applet which can be executed by the client 12." *Id.* at 9:34–36; *id.* at 9:36–39 ("The applet 26 may also be encoded using any other suitable programming language, scripting language, or the like suitable for use on the client 12."). While the specification purports that "the applet 26 does not merely

contain an executable program as with typical applets," but rather, "comprises particular services and data for the client 12 based on the request," *id.* at 9:40–43, no specialized equipment or programming is required or disclosed in either the claims or specification. Instead, the specification states only that "[t]he applet 26 may be generated either directly by the web server application 20 or by an external program utilized by the web server application 20." *Id.* at 9:39–46. Thus, while only Java "applets" allegedly necessitated the invention, Dynamic contends that the claimed "applet" is broadly *any* conventional "program code that can be used by a client device." (Compl. ¶ 34.)

Claim 17 also recites generic functional language relating to generic computing concepts such as "receiving" and "collecting" data, and "generating" and "transferring" an applet containing data and executable code. The second column below identifies the generic computing concepts of claim 17:

| Claim 17 | General Computing Concept |
|---|---|
| 17. A method of processing data: | |
| (a) receiving a data request from a client device at a server system over a link; | Receiving Data |
| (b) collecting on the server a plurality of data items in response to the data request; | Collecting Data |
| (c) generating an executable applet dynamically in response to the data request, a constituent system associated with the applet including a subset of the data items therein as pre-loaded values; wherein a further constituent system associated with the executable applet | Generating Program Code Containing Data and Functionality |

| | |
|---|---|
| comprises a data interface capability configured to provide a plurality of operations on the preloaded values, the operations comprising operations associated with the subset of the data items; and | |
| (e) transferring the applet to the client device. | Sending Program Code |

As shown above, claim 17 recites generic functional steps, like "receiving," "collecting," "generating," and "sending" information, using generic computer components like a "client device," a "server," a "communications link," and an "applet."

## III.   LEGAL STANDARD

### A.   This Case Should Be Disposed of at the Pleading Stage through Rule 12(b)(6).

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (internal citations and quotations omitted). In deciding a Rule 12(b)(6) motion, courts consider documents attached to or incorporated into the complaint as well as facts alleged in the complaint. *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996). Although factual allegations are taken as true, legal conclusions are given no deference—those matters are left for the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting tenet that allegations are taken as true on a motion to dismiss "is inapplicable to legal

conclusions"). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier*, 503 F.3d at 401 (internal citations and quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu*, LLC, 772 F.3d 709, 718–19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp*, 687 F.3d at 1273 ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101."). The § 101 inquiry in this case is particularly ripe for disposition at the pleadings stage because, as Dynamic admitted in its Complaint, "[t]he scope and construction of the claims of the '111 Patent have been clarified" in prior litigation. (Compl. ¶ 25.)

### B.    The Law of 35 U.S.C. § 101

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Also, the law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and ***abstract ideas***." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) (emphasis added). Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611–12. In other words, "abstract intellectual concepts are not patentable, as they are the basic tools

of scientific and technological work." *Id.* at 653 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2355. Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and citations omitted).

Transformation into a patent-eligible application requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)).  Indeed, if a claim could be performed in the human mind, or by a human using pen and paper, it is not patent-eligible. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). Also, a claim is not meaningfully limited if it includes only token or insignificant pre- or post-solution activity—such as identifying a relevant audience, category of use, field of use, or technological environment. *Mayo*, 132 S. Ct. at 1297–98, 1300–01; *Bilski*, 561 U.S. at 610; *Diamond v. Diehr*, 450 U.S. 175, 191–92 & n.14 (1981); *Parker v. Flook*, 437 U.S. 584, 595 n.18 (1978). Finally, "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300; *see also Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) ("Such a broad and

general limitation does not impose meaningful limits on the claim's scope."). "Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("*IV-Capital One*").

## IV.    ARGUMENT

### A.    The Patent-in-Suit is Invalid Under 35 U.S.C. § 101

Dynamic's Complaint should be dismissed. The claims of the '111 Patent are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. All of the claims are directed to the abstract idea of bundling and sending information responsive to a request. Abstract ideas are not eligible for patenting. None of the claims contain an "inventive concept sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355 (emphasis added). Because Dynamic has failed to state a claim upon which relief may be granted, Hollister respectfully requests that the Court grant its motion and dismiss this case with prejudice. Fed. R. Civ. P. 12(b)(6).

### 1.    *Alice* Step 1

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. Under any plausible reading, the claims of the '111 Patent are directed to an unpatentable, abstract idea because they claim nothing more than the "longstanding," "routine," and "conventional" concept of bundling and sending information responsive to a request. *See*

*Id.* at 2356; *Bilski*, 561 U.S. at 611.

              (a)      **Bundling and sending information responsive to a request is an abstract idea.**

Asserted claim 17 is representative of the claims of the '111 Patent.[1] *See, e.g.,* *Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8–9 (E.D. Tex. Mar. 8, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea."). In assessing whether claim 17 is directed to an abstract idea, the Court must look past the claim language for the purpose of the claim to determine what the invention is trying to achieve. *Morales v. Square, Inc.*, 75 F. Supp. 3d. 716, 725 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). All claim 17 is "trying to achieve" is an "efficient" way to bundle and send information (i.e., an executable applet together with "needed data" and functional components required by the applet) in response to a request.

Stripped of its excess verbiage, claim 17 can be broken down into four main steps: (i) receiving a data request from a client; (ii) collecting data responsive to the request; (iii) generating an executable applet containing the collected data and functionality; and (iv) transferring the applet to the client. The dependent claims add limitations that merely involve implementing conventional wireless communication (claim 22) and specifying

---

[1] Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).

the type of data contained in the applet (claims 23 and 26).

Both the specification and Dynamic's Complaint confirm that the core of the claims—the essential, most important aspect—is the abstract idea of bundling and sending information responsive to a request. (Compl. ¶¶ 9, 13.) The goal of the claimed invention is to provide a "method . . . for responding to a client request so as to reduce bandwidth usage over a low-speed connection and reduce the consumption of storage space on the client." '111 Patent, 2:27–31. The claimed invention purportedly accomplishes this goal "[b]y transmitting the appropriate data and associated data handling capabilities as a group." *Id.* at 3:13–17. In other words, the claims merely purport to bundle and send information (e.g., an executable applet containing data and data handling capabilities) responsive to a request instead of sending the same data in separate transmissions.

The process of bundling and sending things in response to a request is an activity "humans have always performed," *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)—a basic tool in the "storehouse of knowledge" that is "free to all . . . and reserved exclusively to none." *Bilski*, 561 U.S. at 602. For example, retailers, like Amazon, often ship multiple purchased items in a single box in response to an order placed by a customer to ship more efficiently. Bundling an applet together with "needed data" and its functional component parts before transmission is no different.

That the methods claimed by the '111 Patent require the use of conventional computer components and multiple steps does not make the claims any less abstract.

-13-

Take for example fulfilling an order for a kitchen table by shipping furniture pieces that must be assembled at home before the table can be put to use. A consumer may need to make additional trips to the hardware store to get tools and other components (e.g., screws or other hardware) required to assemble the table. In contrast, many stores like IKEA will include the necessary screws and screwdriver in the box with the furniture as one bundled package. Thus, multiple shipments or transactions are reduced to a single shipment. The table below illustrates this analogy by comparing claim 17 to an adapted version of claim 17 that substitutes "data request" for "order," "client device" for "customer," "server system" for "furniture store," "data items" for "furniture pieces and hardware," "executable applet" for "package," "operations" for "tools," and "transferring" for "shipping."

| Claim 17 | Providing All Components Necessary To Assemble Furniture |
| --- | --- |
| 17. A method of processing data: | A method for providing a piece of furniture: |
| (a) receiving a data request from a client device at a server system over a link; | (a) receiving an order from a customer at a furniture store; |
| (b) collecting on the server a plurality of data items in response to the data request; | (b) collecting at the furniture store a plurality of furniture pieces necessary to assemble the ordered furniture; |
| (c) generating an executable applet dynamically in response to the data request, a constituent system associated with the applet including a subset of the data items therein as pre-loaded values; | (c) creating a package in response to the order, a portion of the package including furniture pieces and hardware necessary to assemble the ordered furniture; |
| (d) wherein a further constituent | (d) wherein a further portion of the package |

| system associated with the executable applet comprises a data interface capability configured to provide a plurality of operations on the preloaded values, the operations comprising operations associated with the subset of the data items; and | comprises tools necessary to assemble the pieces into the ordered furniture; |
|---|---|
| (e) transferring the applet to the client device. | (e) shipping the package to the customer. |

As this comparison illustrates, the method claimed by the '111 Patent is no different from an activity humans have long performed—bundling and sending things in response to a request—except that the claimed method is applied using conventional computer technology (i.e., "client device," "server," and "applet"). *See Alice*, 134 S. Ct. at 2359 (finding routine activity long performed by humans and simply implemented on a computer does not confer patentability).

> **(b)    Because bundling and sending information responsive to a request as claimed in the '111 Patent is untethered to a specific implementation, it is abstract.**

Importantly, the '111 Patent does not disclose any special way of bundling and sending information responsive to a request, and no specific hardware configuration is required. To the contrary, it teaches that "a handheld or credit-card-size portable computing device" coupled to "any variety of suitable server computer systems well known in the art" over "any of a variety of . . . suitable wireless and non-wireless communications links" would be capable of practicing the method. '111 Patent, 8:9–9:10. Nor is the claimed invention sufficiently tied to any particular programming

configuration. Rather, it teaches that the executable applet "may comprise Java, ActiveX or other suitable type of applet which can be executed by the client," or "may also be encoded using any other suitable programming language, scripting language, or the like suitable for use on the client." *Id.* at 9:34–38.

Although the '111 Patent purports to provide a more efficient transmission of information by "including all or most of the required data and the associated functionality in a single transmission to the client," *id.* at 8:4–8, as discussed above, such application of a long-standing human activity (e.g., bundling a package of requested items), even if sited in the technological environment of executable applets, does not make the claims any less abstract. *See Alice*, 134 S. Ct. at 2359. This is particularly true since the patentee acknowledged that such executable applets were used in the prior art, and that it was conventional in the prior art to dynamically generate webpages with data responsive to their request. *See, e.g.*, '111 Patent at 5:61–6:6. That the "needed data" and functional components are sent together with the applet in one transmission does not change the analysis.

Nor does the abstract concept of the '111 Patent "become nonabstract" merely because the claims involve the "technological environment" of conventional components and the use of standard communications systems. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1319 (Fed. Cir. 2016) (citation omitted) ("*IV-Symantec*"); *see also Alice*, 134 S. Ct. at 2358. In *TLI*, the Federal Circuit observed that although the representative claim required "concrete, tangible components such as 'a telephone unit' and a 'server,' the specification [made] clear that the recited physical components merely provide a

generic environment in which to carry out the abstract idea of classifying and storing digital [data] in an organized manner." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016). The same is true of the claims of the '111 Patent.

Moreover, like other computer-implemented claims found patent-ineligible, the '111 Patent claims merely claim a desired result without explaining "how this would be technologically implemented" in any non-conventional way—the claims specify no "particular way of programming or designing the software." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241, 1244 (Fed. Cir. 2016). Instead, they contain broad functional language and only recite a desired goal of bundling and sending information in response to a request. *See* '111 Patent cl. 17 (i.e., "receiving a data request," "collecting . . . data items," "generating an executable applet . . . including a subset of the data items . . . [and] a data interface capability," and "transferring the applet"). Such "vague, functional" terms, "devoid of technical explanation as to how to implement the invention" in any non-conventional way, cannot confer eligibility. *TLI*, 823 F.3d at 615; *see also, e.g., Two-Way Media Ltd. v. Comcast Cable Comms., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016); *Affinity Labs of Texas v. DirectTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

The '111 Patent claims are materially indistinguishable from claims involving computer-implemented collection and sending of information that the Federal Circuit found were directed to abstract ideas. For example, in *Electric Power*, the Federal Circuit

held that claims for "detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events" were "clearly focused on the combination of . . . abstract-idea processes" such as "collecting information" and "analyzing information," and then "presenting the results of abstract processes of collecting and analyzing information." 830 F.3d at 1352–54. Moreover, in *Content Extraction*, the Federal Circuit concluded that claims generally reciting "a method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory" were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." 776 F.3d at 1345–47. Also, in *Internet Patents*, the Federal Circuit held that claims directed to "the use of a conventional web browser Back and Forward navigational functionalities without data loss in an online application consisting of dynamically generated web pages" were abstract. 790 F.3d at 1344. The Federal Circuit noted that a specific mechanism for "maintaining the state" of the web page—described by the patent as the essential innovation—was not described, so the claim was merely directed to the idea itself—"the abstract idea of avoiding loss of data." *Id.* at 1348. Likewise, notwithstanding their technological context, the claims in *Two-Way Media* were directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information." 874 F.3d at 1337.

-18-

      **(c)**      **Because the '111 Patent claims are not directed to a specific improvement in a computer's capabilities, they are abstract.**

Three recent Federal Circuit cases finding claims patent-eligible at *Alice* step one are notably different from this case. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017); *Core Wireless Licensing S.A.R.L. v. LG Elecs, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018). In those cases, unlike here, the claims recited "*specific* . . . improvement[s] in computer capabilities." *Enfish*, 822 F.3d at 1336 (emphasis added); *see also McRO*, 837 F.3d at 1313-14; *Visual Memory*, 867 F.3d at 1258 (finding that "claims focus on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool'") (citation omitted); *Core Wireless*, 880 F.3d at 1362 (finding that the "asserted claims in this case are directed to an improved user interface for computing devices, not to the abstract idea of an index").

Here, the '111 Patent "fails to provide any technical details for the tangible components" and "instead predominantly describes the system and methods in purely functional terms" using nothing more than conventional computer components ('111 Patent 8:9-9:47) and non-specified, amorphous language like "constituent system" and "associated with" (*id.* at 11:7–12:65). *TLI*, 823 F.3d at 612 (distinguishing *Enfish*); *see also FairWarning*, 839 F.3d at 1094 (distinguishing *McRO* and *Enfish*); *IV-Symantec*, 838 F.3d at 1313-14, 1315, 1321, n.5 (same); *Affinity Labs-DirecTV*, 838 F.3d at 1262 (same); *Ameranth*,

842 F.3d at 1241 (distinguishing *McRO*). As discussed above, here the claimed steps and components "do no more than describe a desired function or outcome, without providing any limiting detail" to "confine[] the claim to a particular solution." *Affinity Labs-DirectTV*, 838 F.3d at 1269. The '111 Patent does not purport to claim any new computer capability, any new applet, any new data structure, or any new functional components, but rather relies on use of the well-known capabilities of computers to bundle these conventional pieces into one package before sending to a client device. *See, e.g.*, '111 Patent 3:13-17. That is, the claims of the '111 Patent do not recite "an improvement in computers as tools," but instead "use computers as tools" to perform the abstract idea of bundling and sending information responsive to a request. *See Elec. Power*, 830 F.3d at 1354.

### 2.    *Alice* Step 2

Because claim 17 is directed to an abstract idea, the Court must next determine whether it contains an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). To pass this test, claim 17 "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, claim 17 is broadly generic and does not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

(a)     **Claim 17 contains no inventive concept to transform the abstract idea into patent-eligible subject matter.**

Independent claim 17 merely recites performing an abstract idea using conventional computer functions: receiving a request, collecting data, generating an applet, and sending the applet. '111 Patent cl. 17. Such steps are "basic functions of a computer" and do not make the claims eligible. *See Alice*, 134 S. Ct. at 2359-60 (citation omitted). In addition, the use of "purely functional and generic" computer components is insufficient. *Id.* at 2360. Claim 17 is full of these generic and functional components: "a client device," "a server," "a communications link," "an executable applet," and a "constituent system associated with the applet." '111 Patent cl. 17.

Courts have repeatedly found such components and functions non-inventive. In *Alice*, for example, the Supreme Court held that claims reciting a "data processing system" with a "communications controller" for obtaining, modifying, and transmitting data was non-inventive. *Alice*, 134 S. Ct. at 2359-60. The Federal Circuit also has held similar basic computer functions and components to be insufficient to confer eligibility. *See, e.g., IV-Capital One*, 792 F.3d at 1367-71 (using an "interactive interface" and "break[ing down] and organiz[ing] . . . data according to some criteria" and monitoring data is non-inventive); *Internet Patents*, 790 F.3d at 1348 (finding Back and Forward functionality of web pages to be "conventional," "well-known," and "common") *buySAFE v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (sending data over network is "'not even arguably inventive'"); *Dealertrack*, 674 F.3d at 1333 (finding "selectively forwarding" information and forwarding reply data is non-inventive).

Even when these basic functions and components are viewed "as an ordered combination," they do not reveal a "non-conventional and non-generic arrangement of known, conventional pieces" that might provide an inventive concept. *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (explaining that the claims at issue involved a technological solution that overcame a specific challenge unique to the Internet). Unlike the handful of particular enhancements to computer technology (or application of the abstract idea to improve another technology or process) that the Federal Circuit has found eligible at *Alice* step two, the claims here merely apply an abstract idea (bundling and sending information in response to a request) in a computer environment without specifying any specific, non-conventional way to accomplish or practice the idea. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151–52 (Fed. Cir. 2016) (distinguishing *DDR* and *Bascom*); *IV-Symantec*, 838 F.3d at 1321 (same); *Affinity Labs-DirecTV*, 838 F.3d at 1261–62, 1265 (same).

Neither the claims nor their arrangement of components and processes improve: (i) the applet itself, (ii) the "needed data," (iii) the functional components required to executed the applet (e.g., Java objects and classes), or (iv) the transmission process. Instead, the conventional arrangement and processes simply purport to transmit all the information together in a bundled package in an effort to reduce the number of network transmissions. In other words, the claims' arrangement of computer components and processes merely purport to provide a more efficient method of bundling and sending information. However, in addressing the second step of *Alice*, claiming the improved

-22-

speed or efficiency inherent with applying an abstract idea on a computer does not provide a sufficient inventive concept. *See IV-Capital One*, 792 F.3d at 1367. What the applicant needed to do is claim a specific technical mechanism for accomplishing the abstract idea of bundling, but he did not. Thus, the independent claim adds only insignificant limitations that do not render it patent eligible.

### 3. The remaining claims are also abstract.

The remaining asserted claims of the '111 Patent relate to the same abstract concept of bundling and sending information responsive to a request. The only differences are immaterial in the context of a § 101 analysis and relate to (i) implementing wireless communication and (ii) static, or non-updateable, data. *See, e.g.*, '111 Patent at cls. 22, 23, and 26. But specifying the type of data or communication that is used is a token or insignificant pre-solution activity insufficient to transform the abstract idea into patent-eligible subject matter. *See Mayo*, 132 S. Ct. at 1297–98, 1300–01.

The unasserted claims fair no better. For example, the claims include the additional limitations (i) that the applet is discarded after use (claims 8, 18), (ii) that a loader is used to update the data (claims 13, 21), and (iii) regarding the type of data request or applet used (claims 16, 24). But conventional Java applets were discarded after use, '111 Patent at 6:30–31, so there is no inventive step in claims 8 and 18. And the type of data request (web page request) and applet (Java applet) recited in claims 16 and 24 were conventional. *See id.* at 6:5–6 (discussing conventional web page data requests); 5:61–6:5 (discussing conventional Java applets).

None of these additional features amounts to an inventive feature or renders the claims any less abstract. Regardless of their form, therefore, all of the claims of the '111 Patent fail both prongs of *Alice* because they are directed to an abstract idea and recite no inventive concept. *Alice*, 134 S. Ct. at 2355, 2357.

**B.      The Disproportionate Risk of Preemption Confirms that the Claims Are Abstract**

Because the claimed method can be implemented using virtually any computer or electronic device capable of connecting to any communications link (e.g., a cellular phone), any conventional kind of executable applet (e.g., any "program code that can be used"), any means of bundling (e.g., any "constituent system"), and any conventional server capable of sending and receiving information, the '111 Patent risks preempting *all* automated methods for using a computer server to bundle and send information in response to a request. *See, e.g., Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 843 (E.D. Tex. 2014) (finding "preemptive effect . . . broad" where "the claims [were] largely functional in nature, they [did] not provide any significant description of the particular means by which the various recited functions are performed," and "[a]ll that [was] disclosed [was] the ultimate objective"). In its Complaint, Dynamic admits that "the '111 Patent is widely implemented" and "the patented invention can be used for a variety of websites in many diverse businesses, including movie, clothing, automobiles, and general and specialty retailers along with entities providing services such as banking, auction, design, travel, and entertainment services." (Compl. ¶ 17.) Virtually none of these websites use the Java applets that the applicant stated suffered from problems in

the prior art. The breadth of use of the alleged abstract idea demonstrates that the claims are so broad they capture the abstract idea itself, and are not proportionate to the problem the applicant was actually trying to solve and allegedly improved upon. Therefore, the claims implicate the same preemption concern undergirding the § 101 analysis and should be found ineligible.

## V.     CONCLUSION

For the foregoing reasons, Hollister respectfully requests that the Court dismiss Dynamic's Complaint for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, Hollister requests dismissal with prejudice.

Dated: February 22, 2018                        Respectfully submitted,

                                                By:  */s/ David B. Conrad*
                                                     Neil J. McNabnay
                                                     mcnabnay@fr.com
                                                     Texas Bar No. 24002583
                                                     David B. Conrad
                                                     conrad@fr.com
                                                     Texas Bar No. 24049042
                                                     Lance Wyatt
                                                     wyatt@fr.com
                                                     Texas Bar No. 24093397
                                                     Theresa M. Dawson
                                                     tdawson@fr.com
                                                     Texas Bar No. 24065128

                                                     FISH & RICHARDSON P.C.
                                                     1717 Main Street, Suite 5000
                                                     Dallas, TX 75201
                                                     (214) 747-5070 (Telephone)
                                                     (214) 747-2091 (Facsimile)

                                                **ATTORNEYS FOR DEFENDANT
                                                HOLLISTER CO.**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on February 22, 2018, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

                                                */s/ David B. Conrad*
                                                David B. Conrad